**Electronically Filed
Intermediate Court of Appeals
30241
07-MAY-2013
08:21 AM**

NO. 30241

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


ROBERT D. JOHNSON, JR., as co-guardian
of the person of MICHAEL A. JOHNSON,
an incapacitated adult, Plaintiff-Appellee/Cross-Appellant,
v. STATE OF HAWAI'I, Defendant-Appellant/Cross-Appellee,
and RAINBOW REHABILITATION SERVICES, INC., a Hawai'i
Corporation, dba Rainbow House; JASON J. MOSSHOLDER-BROM,
Appellees, and JOHN DOES 1-10; JANE DOES 1-10; DOE
CORPORATIONS 1-10; and DOE PARTNERSHIPS 1-10, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 07-1-1855)


AMENDED MEMORANDUM OPINION
(By:  Nakamura, Chief Judge, Fujise and Leonard, JJ.)

Defendant-Appellant/Cross-Appellee State of Hawai'i (**State**) appeals from the Final Judgment entered on November 17, 2009 (**Judgment**), by the Circuit Court of the First Circuit (**Circuit Court**),[1] in favor of Plaintiff-Appellee/Cross-Appellant Robert D. Johnson, Jr. (**Plaintiff**),[2] as co-guardian of Michael A. Johnson (**Michael**), and against the State and Defendant-Appellee Jason J. Mossholder-Brom (**Mossholder-Brom**).  The State contends that Plaintiff's suit is barred by the applicable statute of limitations.  Plaintiff cross-appeals from the

---

[1]    The Honorable Eden Elizabeth Hifo presided.

[2]    Robert Johnson is Michael Johnson's father.

Judgment, challenging numerous factual findings and the Circuit Court's award of only limited special damages, as well as the denial of Plaintiff's request for attorneys' fees.

I.    BACKGROUND

    A.    Michael's Referral to Rainbow House

Pursuant to Hawaii Revised Statutes (HRS) § 334-2 (2010), the State's Department of Health (DOH) is mandated to "foster and coordinate a comprehensive mental health system[.]" HRS chapter 334 further directs DOH to

> promote and provide for the establishment and operation of a community-based mental health system responsive to the needs of persons of all ages, ethnic groups, and geographical areas of the State, reflective of an appropriate distribution of resources and services, and monitored and evaluated in terms of standards, goal attainment, and outcomes.

HRS § 334-3(a) (2010).    In 1974, the Hawai'i State Legislature (Legislature) enacted legislation that established the responsibility for children's mental health services with DOH. 1974 Haw. Sess. Laws Act 211, § 1 at 469-72.    The Child and Adolescent Mental Health Division (CAMHD) was established within DOH to "coordinate the effective and efficient delivery of mental health services to children and youth, including services provided by private nonprofit agencies under contract to the department of health, and be responsible for the development and implementation of centralized and highly specialized programs for children and youth."    HRS § 321-172 (2010).

Pursuant to the foregoing authority, in 1999, the State entered into an agreement with Rainbow House to provide "community-based treatment mental health services to children" as part of the State's statutorily mandated community-based mental health care system.

Michael was born on October 4, 1986, and suffers from, inter alia, mild mental retardation, ADHD, Tourette's Disorder, Oppositional Defiant Disorder, and Mood Disorder.    From kindergarten through the tenth grade, Michael was enrolled in

special education classes with the State Department of Education (DOE). During Michael's tenth grade year, he experienced a series of behavioral episodes that required hospitalization. Specifically, in October 2001, following an attempted suicide and an argument with his father, Michael was admitted to Kahi Mohala Acute Inpatient Services for psychiatric treatment. Michael's treating physician completed a psychiatric evaluation and recommended that Michael be placed in a structured group home with ongoing individual therapy and medication management.

On November 5, 2001, DOE notified Michael's parents that it was not able to meet Michael's needs and that his condition required monitoring and intervention by DOH. Michael was registered with the Leeward Oahu Family Guidance Center (LOFGC), a satellite office of CAMHD, and a team of individuals recommended that the DOH provide assistance for Michael based on his suicidal tendencies, his need for "continual monitoring throughout a 24 [hour] period," his need for "an intense level of medication monitoring," and the possibility that he may need "cognitive restructuring therapy[.]" In response to the recommendation, DOH indicated that it would review a copy of the attending hospital's evaluation and make a determination of Michael's level of need.

DOH subsequently developed a "Coordinated Service Plan" (CSP) with the initial goal of putting Michael in a stable home environment. In order to meet this goal, the CSP stated that DOH would place Michael in a "group home placement" which provides "intensive psychotherapy with a therapist" to help address Michael's poor social skills with peers, oppositional behavior, and his tolerance to frustration. On February 8, 2002, CAMHD informed the LOFGC that referral of Michael to Rainbow House was clinically appropriate.

On February 13, 2002, Michael was admitted to Rainbow House. While there, Mossholder-Brom acted as Michael's personal and family therapist.[3/] Between November 23, 1999 and January 2002, Mossholder-Brom had been misrepresenting himself as a qualified mental health care professional on treatment records provided to CAMHD. When Michael was referred to Rainbow House, CAMHD had not yet obtained documentation of Mossholder-Brom's qualifications. Although Mossholder-Brom was given "full credential status" based on a meeting of CAMHD's credentialing committee, his credentialing status was rescinded on June 1, 2002, based on clear evidence regarding the misrepresentation of his qualifications.

On April 11, 2000, approximately two years prior to Michael's referral to Rainbow House, all referrals to Rainbow House were suspended due to a lack of clinical oversight and inadequate staffing. There are no records indicating that Rainbow House corrected the clinical oversight and staffing deficiencies leading to the suspension of referrals. Further information received by CAMHD indicated that a staff member at Rainbow House had engaged in inappropriate sexual misconduct with a child, and that Rainbow House was in violation of its licensing requirements because there were too many youths housed there. Moreover, during the time prior to and including the time period when CAMHD determined it was clinically appropriate to refer Michael to Rainbow House, Rainbow House was not in compliance with CAMHD's reporting requirements. Michael's parents were not informed of the deficiencies at Rainbow House or the allegations of sexual assault by Rainbow House staff prior to CAMHD's referral.

--------

[3/] On April 2, 2009, the Circuit Court entered default judgment against Mossholder-Brom pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 55(a).

Beginning approximately two months after Michael's placement at Rainbow House, Mossholder-Brom engaged in sexual acts with Michael that included multiple incidents of oral sex and at least one instance of anal sex.

On May 16, 2002, Michael was examined by the clinical director of the LOFGC, Dr. John Viesselmann (**Dr. Viesselmann**). Dr. Viesselmann noted, amongst other things, that Michael was preoccupied with getting out of the Rainbow House program and had expressed concerns about his sexual interests.

On August 31, 2002, Michael was involved in a group-sex incident, involving six youths residing at Rainbow House, in one of the facility's dormitory rooms.  On September 26, 2002, Michael reported to his LOFGC care coordinator what had happened during the group-sex encounter, including information that Rainbow House had consented to an unsupervised gathering in the dormitory room, and that he had been forced to perform sex acts with two other youths.  No formal complaints were filed based on information from Rainbow House that they had taken "appropriate corrective action."  Rainbow House's internal investigation of the incident, and all interviews related to the incident, were conducted by Mossholder-Brom.  There is no indication in the record that Michael was provided psychosexual counseling or treatment relating to the group-sex incident.

Mossholder-Brom was released from his employment at Rainbow House on or about October 18, 2002.

On or about October 21, 2002, Michael was hospitalized at Kahi Mohala after he attempted to run into traffic and kill himself.  Medical records of Michael's hospitalization note that he had become "quite attached" to his therapist at Rainbow House, and that he was distraught that the therapist was no longer working with Michael.  A CSP, dated November 8, 2002, indicates that Michael was returned to Rainbow House after the October

hospitalization. It is not clear from the record when Michael was ultimately discharged from Rainbow House.

Approximately one year later, on or about October 2, 2003, Michael reported to his then-psychotherapist, Carolyn Carlson (**Dr. Carlson**), for the first time, that he had been sexually assaulted by Mossholder-Brom on multiple occasions during his residency at Rainbow House. Michael later testified that he told Dr. Carlson about the sexual relationship with Mossholder-Brom because he felt what had happened "was wrong," "[b]ecause I was a minor and he was an adult and - and I had like . . . bad dreams about it." Dr. Carlson then relayed the information about the sexual abuse to Michael's parents.

B.    Proceedings Below

On October 3, 2007, Plaintiff filed a complaint with the Circuit Court against Defendants Rainbow House,[4] Mossholder-Brom, and the State.[5] In the complaint, Plaintiff asserted a claim of negligence against Rainbow House and the State for "negligently hiring, training, retaining and supervising Defendant Jason Brom[,]" and for providing "inadequate care and treatment for Michael," "breaching standards of care," failing "to provide effective oversight of the mental health care services provided to Michael," and for "the failure of the State

---

[4]    On March 10, 2009, a stipulation for partial dismissal with prejudice was filed as to all claims by Plaintiff against Rainbow House.

[5]    Pursuant to HRS § 671-12(a) (1993), "any person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State." Plaintiff submitted a claim with the medical claim conciliation panel (**MCCP**) on October 3, 2006. Pursuant to HRS § 671-18, the filing of a claim with the MCCP "shall toll any applicable statute of limitations" for a maximum of twelve months from the date the claim was filed. HRS § 671-18 (Supp. 2011). If a decision by the MCCP is not reached within twelve months, "the statute of limitations shall resume running and the party filing the claim may commence a suit based on the claim in any appropriate court of this State." Id. On October 1, 2007, the MCCP notified Plaintiff of its inability "to convene a hearing for the matter before the tolling period lapses and the statute of limitations recommences," and therefore, after October 3, 2007, Plaintiff was able to "pursue any appropriate legal remedies through the judicial system."

to provide safe and therapeutic mental health care for Michael following the sexual assault by Defendant Jason Brom[.]" Plaintiff sought general, special, and punitive damages, and costs.

On December 6, 2007, the State filed a motion to dismiss Plaintiff's complaint as barred by the expiration of the statute of limitations under the State Tort Liability Act, HRS Chapter 662. On April 8, 2008, Plaintiff filed their opposition to the State's motion to dismiss, claiming that the claims are "medical torts" governed by a six-year limitations period, and therefore, the complaint is timely filed. A hearing on the motion to dismiss was held on April 16, 2008. At the hearing, the Circuit Court determined that "the law does define a medical tort in the context which is applicable here to include Mr. Mossholder-Brom as an employee of Rainbow [House,]" and the State's motion to dismiss was denied as the complaint was filed within the six-year limitations period governing medical torts. The order denying the State's motion to dismiss was filed on April 23, 2008.

A non-jury trial on the merits was held from September 14, 2009 through September 21, 2009. At the hearing, Plaintiff presented testimony from nine witnesses, including Michael, his parents, and expert testimony from Dr. Carlson, Dr. Daryl Matthews (**Dr. Matthews**), and rehabilitation nurse Karen Klemme, regarding Michael's injuries and recommendations for future treatment. Following the close of Plaintiff's case, the State did not present any evidence and, after the filing of certain motions (which were denied), rested its case. After an oral ruling on September 21, 2009, the Circuit Court entered its Findings of Fact and Conclusions of Law on October 20, 2009.

The Circuit Court concluded that the State was required by law to establish and operate a community-based mental health care system, to monitor and evaluate the quality of health care,

and to ensure accountability for services provided through the community-based mental health care system. The Circuit Court further concluded that CAMHD is required by law to coordinate the effective and efficient delivery of mental health services to youths like Michael, and that it had a duty to "exercise ordinary care in checking the credentials of care providers at Rainbow House (including Mossholder-Brom) in referring Michael to Rainbow House, and in providing oversight of the services provided by Rainbow House." The Circuit Court also concluded that CAMHD had a duty of care, as a health care provider, to meet the applicable professional standard of care, to protect Michael from foreseeable harm, and to promptly and fully investigate allegations that Mossholder-Brom misrepresented his credentials and engaged in misconduct.

Based on these findings and conclusions, the Circuit Court determined that CAMHD was negligent and violated its duties of care, and that this negligence was a legal cause of the injuries suffered by Michael at Rainbow House. The Circuit Court further determined that the damages suffered by Michael were "reasonably foreseeable to the State" and that the State's negligence "was a legal cause of the sexual assaults committed by Mossholder-Brom, and the State and Mossholder-Brom are jointly and severally liable for Michael's damages." The Circuit Court further determined that Michael suffered "compensable psychological injury and emotional distress resulting from Mossholder-Brom abusing his position of trust and taking advantage of Michael in an intimate and self-defining way," and that Michael also suffered compensable psychological injury and emotional distress "when he felt abandoned by Mossholder-Brom after attempting unsuccessfully to locate him . . . resulting in a feeling of unrequited love after Mossholder-Brom left Rainbow House." The State does not challenge any of these findings and/or conclusions.

The Circuit Court awarded Plaintiff $4,000 in special damages for psychosexual or neuropsychological testing, but did "not award other special damages for past or future treatment of any kind." The Circuit Court further awarded Plaintiff $200,000 in general damages for Michael's psychological injury and emotional distress.

On October 6, 2009, Plaintiff filed a motion for attorney's fees pursuant to HRS § 662-12 (1993)[6] and costs pursuant to HRS § 662-9 (1993).[7] Plaintiff sought attorney's fees in the amount of $74,184.82, or 25% of the total judgment, and $18,554.48 in costs. On October 16, 2009, the State filed its opposition to Plaintiff's request for costs and attorney's fees, arguing that the request for fees should be denied in its entirety as fees should be paid out of the judgment awarded to Plaintiff, and that costs be adjusted to remove charges that are "not awardable." On October 16, 2009, Plaintiff submitted a supplemental memorandum to revise the requested cost award "based on an additional cost item." The revised motion requested a total of $19,466.43 in costs, reflecting the addition of $911.95 in witness travel costs.

On November 4, 2009, the Circuit Court filed its order granting in part and denying in part Plaintiff's motion for attorney's fees and costs. The Circuit Court awarded Plaintiff costs in the amount of $11,742.61, and denied the request for attorney's fees pursuant to HRS § 662-12.

Final judgment was entered on November 17, 2009, in favor of Plaintiff and against the State and Mossholder-Brom.

---

[6] HRS § 662-12 provides, in relevant part, that "[t]he court rendering a judgment for the plaintiff pursuant to this chapter . . . may . . . determine and allow reasonable attorney's fees[.]"

[7] HRS § 662-9 provides, "[i]n an action under this chapter, court costs and fees as set by law may be allowed to the prevailing party."

The State filed its notice of appeal on December 15, 2009. On December 28, 2009, Plaintiff filed a notice of cross-appeal.

II.  POINTS OF ERROR

The State raises a single point of error, contending that "[t]he trial court erred by denying the State's motion to dismiss."[8]

Plaintiff raises three points of error:

(1) contending that the Circuit Court clearly erred when it entered Findings of Fact (**FOFs**) 67-74,

67. The Court finds that Michael does not require a course of residential psychosexual treatment or any other treatment for any injury resulting from the conduct of Mossholder-Brom.

68. The Court finds that Michael is not now (and not likely to become) a sexual predator.

69. The Court does not find Dr. Matthews' opinions credible regarding Michael's need for future residential psychosexual treatment or the likelihood that without such treatment Michael will become a predator or be victimized himself.

70. The Court finds that Plaintiff has not proven by a preponderance of the evidence that future residential psychosexual treatment (or any other treatment that he would not have needed in the absence of the torts at issue here) is appropriate or necessary.

71. The Court does not find Michael's testimony credible regarding his desire for future treatment and his willingness to go to California and be away from his family.

72. The Court finds that there is no evidence Michael has any idea that residential psychosexual treatment would mean that he essentially would be imprisoned for five to eight years and maybe as much as ten years.

73. The Court finds it appropriate for the Court to counsel Michael that there is nothing illegal, wrong or bad about a) being attracted to other people his age who are male or older or b) having a lot of sexual contact, a lot of anal intercourse, a lot of oral intercourse, but noting that as a matter of science such conduct is one of the main ways of communicating AIDS, which is a deadly disease.

74. The Court finds it appropriate for the Court to counsel Michael that when he has unprotected sex or engages the services of male or female prostitutes he is putting himself, that person and anyone else they contact at risk, and that right now there is nothing

_____

[8]  We note that the State, although represented by the Department of the Attorney General of Hawai'i, failed to comply with the <u>requirements</u> of Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4), merely stating the alleged error and failing to address *any* of the other requirements of the rule.

> available to cure AIDS, and the Court is personally
> well aware of this fact as the presiding judge has
> lost two friends to AIDS.

and oral findings that

> So it comes down to [] Dr. Matthews who opined that this
> young man is likely to become a predator.

> I do not find the testimony of Dr. Matthews credible that
> Michael is a predator who will act out.

(2)   contending that, based on the foregoing erroneous
FOFs, the Circuit Court erred in Conclusion of Law (**COL**) 75,

> The Court awards Plaintiff $4,000.00 in special damages for
> psychosexual or neuropsychological testing as recommended by
> Plaintiff's expert psychiatrist, Dr. Matthews.  The Court
> does not award other special damages for past or future
> treatment of any kind.

and

(3)   contending that the Circuit Court abused its
discretion when it denied Plaintiff's request for an award of
attorney's fees.

III. STANDARDS OF REVIEW

"In this jurisdiction, a trial court's FOFs are subject
to the clearly erroneous standard of review.  An FOF is clearly
erroneous when, despite evidence to support the finding, the
appellate court is left with the definite and firm conviction
that a mistake has been committed."  Chun v. Bd. of Trs. of the
Employees' Ret. Sys. of the State of Hawai'i, 106 Hawai'i 416,
430, 106 P.3d 339, 353 (2005) (citations, internal quotation
marks and ellipses omitted) (quoting Allstate Ins. Co. v. Ponce,
105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).  "An FOF is also
clearly erroneous when the record lacks substantial evidence to
support the finding.  [The Hawai'i Supreme Court has] defined
"substantial evidence" as credible evidence which is of
sufficient quality and probative value to enable a person of
reasonable caution to support a conclusion."  Leslie v. Estate of
Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999)

11

(citations and internal quotation marks omitted) (quoting State v. Kotis, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)).

Findings of fact are not to be viewed in isolation, but are "to be construed so as to render them complete and internally consistent, thus avoiding a reversal on purely technical grounds." Iaea v. Iaea, 59 Haw. 648, 650, 586 P.2d 1015, 1016 (1978).  Further, in examining allegedly inconsistent findings of fact, the appellate court will construe the circuit court's findings, "where reasonably possible, to uphold rather than to defeat its judgment."  Id.

> A COL is not binding upon an appellate court and is freely reviewable for its correctness.  [The appellate court] ordinarily reviews COLs under the right/wrong standard.  Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.  However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun, 106 Hawai'i at 430, 106 P.3d at 353 (citations, internal quotation marks and brackets in original omitted) (quoting Ponce, 105 Hawai'i at 453, 99 P.3d at 104).

IV.  DISCUSSION

A.    The Applicable Statute of Limitations

The State argues that Plaintiff's claims against the State, which were first brought before the MCCP on September 25, 2007, are time-barred by Hawaii Revised Statutes (HRS) § 662-4 (1993), because Michael's injuries occurred in 2002 and were discovered no later than October of 2003.

> HRS § 662-4 provides:
> **§ 662-4  Statute of limitations.**  A tort claim against the State shall be forever barred unless action is begun within two years after the claim accrues, except in the case of a medical tort claim when the limitation of action provisions set forth in section 657-7.3 shall apply.

(Emphasis added.)

12

The State argues (1) that Plaintiff's claim is not a medical tort and therefore HRS § 657-7.3 does not apply, and (2) even if it is a medical tort, it is time-barred by the HRS § 657-7.3.  We address each of these in turn.

1.    Medical tort

Plaintiff's claim is a medical tort.  The term "medical tort" is defined in HRS § 671-1(2) (1993)[9] as follows:

> "Medical tort" means professional negligence, the rendering of professional services without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient.

(Emphasis added.)

The term "health care provider" is defined in HRS § 671-1(1) (1993)[10] as follows:

> "Health care provider" means a physician or surgeon licensed under chapter 453, a physician and surgeon licensed under chapter 460, a podiatrist licensed under chapter 463E, a health care facility as defined in section 323D-2, and the employees of any of them.  Health care provider shall not mean any nursing institution or nursing service conducted by and for those who rely upon treatment by spiritual means through prayer alone, or employees of such institution or service.

(Emphasis added.)

The term "health care facility" is defined in HRS § 323D-2 (2010) as follows:

> "Health care facility" and "health care service" include any program, institution, place, building, or agency, or portion thereof, private or public, other than federal facilities or services, whether organized for profit or not, used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care to any person or persons.  The terms include, but are not limited to, health care facilities and health care services commonly referred to as hospitals, extended care

---

[9]    HRS § 671-1(1), but not HRS § 671-1(2), was amended in 2009.  See 2009 Haw. Sess. Laws Act 151, § 25 at 438; 2009 Haw. Sess. Laws Act 151, § 67 at 33.

[10]    In 2009, the definition of "health care provider" in HRS § 671-1 was amended to add "physician assistant" and "osteopathic physician," and to omit "physician and surgeon licensed under chapter 460." See 2009 Haw. Sess. Laws Act 151, § 25 at 438; 2009 Haw. Sess. Laws Act 151, § 67 at 33.

and rehabilitation centers, nursing homes, skilled nursing facilities, intermediate care facilities, hospices for the terminally ill that require licensure or certification by the department of health, kidney disease treatment centers including freestanding hemodialysis units, outpatient clinics, organized ambulatory health care facilities, emergency care facilities and centers, home health agencies, health maintenance organizations, and others providing similarly organized services regardless of nomenclature.

(Emphasis added.)

The State argues:

The State referred Michael to Rainbow House. Rainbow House through Mossholder-Brom's actions were the proximate cause of Michael's injury. The State's referral was not a medical tort, thus HRS § 657-7.3 does not apply to [Plaintiff's] claims against the State.

This argument is without merit. The Circuit Court found and concluded, and the State does not challenge, *inter alia*, that: (1) on or about January 23, 2002, "DOH assumed the responsibility of placing Michael in a structured group home capable of providing 'intensive psychotherapy with a therapist' and ongoing medication management by a psychiatrist"; (2) Michael was admitted to Rainbow House on February 13, 2002, with Mossholder-Brom acting as his personal and family therapist; (3) the State was required by law to coordinate effective and efficient delivery of mental health services to Michael; (4) the State had a duty to meet the applicable professional standard of care for the mental health treatment Michael received; and (5) the State's "negligence was a legal cause of the injuries suffered by Michael at Rainbow House, as it was not clinically appropriate to refer Michael to Rainbow House and Michael would not have been exposed to Mossholder-Brom or other inadequately supervised residents of Rainbow House if the necessary credentialing and oversight had been followed." These unchallenged findings and conclusions clearly indicate that the State was acting as a health care provider and that the allegations against the State constitute a medical tort pursuant to Hawai'i's statutes and as previously interpreted by Hawai'i

courts. See, e.g., Garcia v. Kaiser Found. Hosps., 90 Hawai'i 425, 438, 978 P.2d 863, 876 (1999); Dubin v. Wakuzawa, 89 Hawai'i 188, 194, 970 P.2d 496, 502 (1998); Doe v. City & Cnty. of Honolulu, 93 Hawai'i 490, 499-02, 6 P.3d 362, 371-74 (App. 2000).

　　　2.　　HRS § 657-7.3

　　　When a claim asserted against the State alleges a medical tort, HRS § 657-7.3 is applied. Having concluded that Plaintiff's claim is a medical tort, we review the State's argument that Plaintiff's action is, nevertheless, time-barred by HRS § 657-7.3. HRS § 657-7.3 (1993)[11] provides:

> **§ 657-7.3 Medical Torts; limitation of actions; time.**
> No action for injury or death against a [health care provider] . . . shall be brought more than two years after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, but in any event not more than six years after the date of the alleged act or omission causing the injury or death. This six-year time limitation shall be tolled for any period during which the person has failed to disclose any act, error, or omission upon which the action is based and which is known to the person.
>
> Actions by a minor shall be commenced within six years from the date of the alleged wrongful act except the actions by a minor under the age of ten years shall be commenced within six years or by the minor's tenth birthday, whichever provides a longer period. . . . The time limitation shall also be tolled for any period during which the minor's injury or illness alleged to have arisen, in whole or in part, from the alleged wrongful act or omission could not have been discovered through the use of reasonable diligence.

　　　Relying on the first paragraph of HRS § 657-7.3, and dismissing the applicability of the second paragraph, the State in effect argues that the statute bars all claims brought more than two years after the discovery of the injury, notwithstanding the minority of the injured person. We reject this argument.

---

[11]　HRS § 657-7.3 was amended in 2010 to change a reference (omitted here as irrelevant) from "naturopath" to "naturopathic physician." See 2010 Haw. Sess. Laws Act 4, § 9 at 12-13.

The second paragraph of HRS § 657-7.3 specifically applies to actions by minors and provides that an action "shall be commenced within six years from the date of the alleged wrongful act[.]" It is clear from the legislative history, as well as the plain language of the statute, that injured minors have no less than six years to seek redress for their injuries. See 1986 Haw. Spec. Sess. Laws Act 2, § 15 at 9-10; S. Spec. Com. Rep. No. S5-86, in 1986 Senate Journal, at 28.

Michael's injuries occurred over the period approximately ranging from February through October of 2002. Michael, who was fifteen when he was placed at Rainbow House, was a minor when the wrongful acts occurred. The claims against the State were asserted no later than September of 2007, well within the six-year statute of limitations.

B.    Plaintiff's Cross-Appeal

1.    The Challenged FOFs and COL

Plaintiff challenges eight written findings of fact, FOFs 67-74, entered by the Circuit Court, two related oral findings, and the Circuit Court's related conclusion, COL 75, that, with the exception of certain psychosexual or neuropsychological testing, Plaintiff should not be awarded any special damages for past or future treatment. Because they are inter-related, we consider these findings individually and collectively, as well as in conjunction with the Circuit Court's other findings and conclusions and the whole record of the evidence presented at trial.

The challenged findings include the Circuit Court's rejection of Dr. Matthews's opinion, as not credible, that Michael was or was likely to become a sexual predator. It is well-established that "the credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 92, 34 P.3d

16, 22 (2001). There is support in the record for the trial court's finding including Dr. Matthews's testimony that he was not aware of any incident in which Michael had sexually molested someone since his release from Rainbow House. Accordingly, we will not disturb the Circuit Court's assessment of this aspect of Dr. Matthew's testimony.

The Circuit Court's findings and determination that Michael did not require *any* treatment whatsoever for his injury, however, are irreconcilably inconsistent with and contradictory to the Circuit Court's unchallenged findings concerning the injury he suffered, the overwhelming and uncontradicted evidence in the record, the Circuit Court's "counseling" of Michael in FOFs 73 and 74, the award of special damages for future psychosexual or neurophysical testing, and the Circuit Court's award of substantial general damages for Michael's suffering.

The Circuit Court's unchallenged factual findings[12] include that: (1) when Michael was referred by the State to Rainbow House, Michael was a minor who suffered from mild mental retardation, ADHD, Tourette's Disorder, and other mental and behavioral problems and required intensive psychotherapy with a therapist and ongoing medication management by a psychiatrist (FOF 4); (2) at Rainbow House, Mossholder-Brom acted as Michael's personal and family therapist (FOF 9); (3) beginning approximately two months after Michael arrived, Mossholder-Brom engaged in multiple instances of oral sex and at least one instance of anal sex with Michael (FOF 24); (4) while Michael was at Rainbow House, a clinical director for the State noted that Michael seemed sluggish and drowsy, abnormal blood work had not been addressed, Michael should have been seen by a clinical

---

[12] These findings of fact are set forth in the Circuit Court's October 20, 2009, Findings of Fact and Conclusions of Law. We note that some of them are categorized by the Circuit Court as conclusions of law, but would more accurately be considered findings of fact or mixed determinations of fact and law. As none of the these findings and conclusions are challenged by the State, and their characterization is not relevant to our analysis, we need not address their specific designations.

psychiatrist much sooner than he had, given the medication he was receiving, that Michael was preoccupied with getting out of the program, and that Michael was concerned about his sexual interests (although no mention was made about the sexual contact with Mossholder-Brom) (FOF 29); (5) while at Rainbow House, Michael was also involved in a group-sex incident in which Michael reportedly was forced to perform oral sex on at least two other residents and after which Michael was physically assaulted by one of the residents involved in the incident; Michael received no psychosexual counseling or treatment relating to this incident (FOFs 34 & 41); (6) several months into his residence at Rainbow House, after the group-sex incident (and during the period of Mossholder-Brom's sexual activities with Michael), it was reported that Michael "had been redirected away from sexually-oriented ideas and conversations on more than one occasion" (FOF 38); (7) within days of Mossholder-Brom being fired, Michael attempted to kill himself, had to be hospitalized, and reportedly was distraught that his therapist was no longer working with him (FOFs 44 & 45); (8) approximately one year later, Michael told his new therapist, Dr. Carlson, that "he had been sexually assaulted by Mossholder-Brom on multiple occasions and that he knew what Mossholder-Brom had done was wrong" (FOF 48); (9) the State was negligent and the State's negligence was a legal cause of injuries suffered by Michael at Rainbow House, specifically including the sexual assaults committed by Mossholder-Brom, who was "unqualified as a therapist and committed repeated tortious acts of non-consensual sexual touching, injurious mental health care treatment and infliction of emotional distress" (COLs 60, 61, 63, 64); (10) that Michael suffered compensable psychological injury and emotional distress resulting from Mossholder-Brom abusing his position of trust and taking advantage of Michael in an intimate and self-defining way (COL 65); and (11) that Michael suffered compensable

psychological injury and emotional distress when he felt abandoned by Mossholder-Brom (COL 66).

In addition, although not incorporated in the Circuit Court's FOFs and COLs, the evidence in the record includes: (1) prior to the sexual incidents with Mossholder-Brom and the group-sex incident, Michael had never had sex with anyone; (2) since then, Michael has reported "bad dreams" about what Mossholder-Brom had done to him, which were continuing at the time of trial; (3) Michael testified that he "really need[s] help" about his "sexual issues", that he has a "sex problem", that he looks for sex on the internet, that he goes to public bathrooms, beaches, video/porn shops, and that he wants to stop doing that; (4) Michael testified that he has unprotected sex because he asks the people if they have AIDS/HIV and they said no; (4) Michael's therapist, Dr. Carlson, testified that, because of his Tourettes, Michael can become overly focused and perseverate, "meaning that he becomes compulsive and obsessed with ideas, people, events, or things he wants" and is unable to stop; (5) Dr. Carlson, who worked with Michael over an 18-month period, testified that "because the [sexual] abuse happened when it did, it messed up [Michael's] perception of boundaries and what he has the right to say yes or no to and what adults want from him . . . it just lifted the sexual compulsions to a [] pathological level"; (6) Dr. Carlson further testified that Michael was perseverating about "getting out in the world and hooking up" and was repeatedly suicidal or threatened suicide; (7) Carlson testified that, for Michael to deal with his perseveration over sexual activity, he needs a comprehensive program "run by adults who have the ability to have significant boundaries with him and model for him appropriate ways of interacting"; she was not aware of any facilities like that in Hawai'i; (8) Dr. Matthews testified that, although Michael had behavioral problems prior to his admission to Rainbow House, there had been no indication of

19

sexual misbehavior, sexual aggression, or sexual identity confusion; (9) Dr. Matthews testified that Mossholder-Brom choked and punched Michael during sexual activity and would undergo "aggressive sexual behavior towards each other"; after that, on one occasion that Dr. Matthews was aware of, Michael developed an erection while he was being restrained, all of which Dr. Matthews viewed as indicative of a paraphilic interest in violence (an arousal pattern associated with violence); (10) Dr. Matthews further testified that, after the sexual molestation incidents at Rainbow House, Michael became "somewhat hypersexual," disregarded any conventional sexual boundaries, was seeking sex in video emporia, public restrooms, through the internet, and had unprotected sex with adults and possibly youths; (11) Dr. Matthews testified to the distinction between Michael's underlying problems and the problems that flowed from the sexual molestation; and (12) Dr. Matthews testified that the goals for Michael's treatment included reducing the sexual acting-out behavior and paraphilic behavior, to improve anger management skills and relationship skills, to reduce Michael's tremendous dependence on others for emotional support, and that without "massive intervention" Michael's prognosis was poor.

The State called no expert witnesses, nor did it call any other witnesses to testify about Michael's need for treatment for the injuries resulting from the extended period of sexual assaults by his trusted therapist. There were no records, reports or exhibits in evidence contradicting Dr. Carlson's and Dr. Matthews's testimony that Michael needed treatment. The Circuit Court does not point to any evidence in support of the finding that "Michael does not require a course of residential psychosexual treatment or any other treatment for any injury resulting from the conduct of Mossholder-Brom" and we find none.

Although concluding that Michael did not need any professional treatment as a result of the sexual abuse and the

"injurious mental health care treatment and infliction of emotional distress" suffered by Michael as a result of the State's negligence, the Circuit Court found it "appropriate" for the court to "counsel" Michael in FOFs 73 and 74 about the danger of AIDs stemming from high-risk behaviors such as "having a lot of sexual contact, a lot of anal intercourse, a lot of oral intercourse," and/or having "unprotected sex or engag[ing] the services of male or female prostitutes". While clearly well-intended, the Circuit Court's counseling in these findings was based on the court's personal experiences and opinions, rather than any medical or other expert opinion delivered in this case. As Plaintiff argues, the court's substitution of these admonitions - given to a mildly retarded person who suffers from Tourette's disorder, other mental and behavioral maladies, and who has been adjudicated to be an incapacitated person under Hawai'i law - for professional treatment is ungrounded in the evidence in the record of this case and the law. Albeit in another context, the Hawai'i Supreme Court has noted that "mental health counseling, . . . like psychiatric care, is a professional realm beyond the expertise of the judiciary." Lee v. Corregedore, 83 Hawai'i 154, 169, 925 P.2d 324, 339 (1996); c.f., People v. Amaya, 42 Colo. App. 295, 297, 592 P.2d 1359, 1360 (1979) (deferring to trial court decision that was supported by uncontradicted expert testimony, court held that "[j]udicial review of a treatment plan is of a limited nature" and "[l]acking expertise in the field of psychiatry, a court may not determine whether the best possible decision was made but rather only whether the treatment plan was rationally based on pertinent information and permissibly implemented"); Gorton v. Johnson, 100 F.R.D. 801, 803 ("[t]he Court is not unmindful of the fact that it lacks expertise in the area of mental health care, and does not presume to have the ability to second-guess the determinations of experts in the related fields"). In this case,

given the uncontradicted evidence that Michael's psychosexual injuries required treatment, the Circuit Court erred when it, in effect, found it sufficient to counsel Michael in lieu of providing for professional mental health treatment.

Finally, we examine the alleged inconsistencies in the damages award set forth in COL 75, wherein the Circuit Court awarded Plaintiff $4,000 in special damages "for psychosexual or neuropsychological testing as recommended by Plaintiff's expert psychiatrist, Dr. Matthews", but did not award other special damages for past or future treatment of any kind. As argued by Plaintiff, the special damages award for testing is based on the following testimony by Dr. Matthews:

> Q. As a result of the sexual abuse Michael suffered and the sexual aggressiveness that you've described, what kind of diagnostic testing have you determine[d] that Michael would need solely related to these issues arising from sexual molestation?
> A. Michael needs a thorough psychosexual evaluation, which he has never had, and that would involve not only detailed interviewing and psychological testing related to sexual function issues . . .
> Q. And what is the frequency of those types of neuropsychological testing? I mean when is that done? Is it a one-time deal? How often is that done?
> A. This particular testing needs to be done once. I think that a future therapist may request it to be done again, by my -- and it might be useful to be done again. But I believe -- I think the treatment plan specifies that we do that once.
>
> . . . .
>
> Q. And you mentioned the need for a full neuropsychological testing at the outset. Is that something that would be necessitated solely as a result of the sexual molestation he suffered at Rainbow House?
> A. Yes.
> Q. And you mentioned that following his treatment program, he might need again a neuropsychological testing. Would that be solely related to his molestation while at Rainbow House?
> A. It would.

The cost of this testing was established through the testimony of Karen Klemme, a board-certified rehabilitation registered nurse and board-certified nurse life care planner, who collaborated with Dr. Matthews "to determine how [Dr. Matthews's] treatment plan could be implemented and the costs associated with

his treatment plan." Karen Klemme testified that the costs for the neuropsychological testing was $2,000 and the costs for the psychosexual testing was in a range between $2,000 and $5,000.

Plaintiff submits that the award of special damages for "psychosexual or neuropsychological testing as recommended by Plaintiff's expert psychiatrist, Dr. Matthews" is completely irreconcilable with the conclusion that Michael does not need any future care or treatment whatsoever because Dr. Matthews's above-referenced testimony, in conjunction of his other testimony and the record as whole, can only be understood to require such testing as a step in Michael's treatment. The State acknowledges that Dr. Matthews's treatment plan included pre- and post-treatment testing, but otherwise ignored the manifest contradictions in the Circuit Court's findings and conclusions, and the clear findings and overwhelming evidence of sexual abuse, substandard care and resulting injuries, instead focusing on the Circuit Court's rejection of Dr. Matthews's opinion that Michael was not, and was not likely to become, a sexual predator or to be victimized.

Finally, we take into consideration the Circuit Court's unchallenged award (in COL 76) of *substantial* general damages, in the amount of $200,000, for Michael's psychological injury and emotional distress. To recover as special damages the value of future medical expenses, a plaintiff must provide sufficient evidence to show that future medical expenses are necessary and the charges reasonable. See, e.g., Condron v. Harl, 46 Haw. 66, 76, 374 P.2d 613, 619 (1962); Kometani v. Heath, 50 Haw. 89, 95, 431 P.2d 931, 936 (1967). Thus, an award of general damages does necessarily contradict a finding of no special damages. Hawai'i's appellate courts have, nevertheless, recognized that general damages for pain and suffering and special damages for medical expenses "are largely dependent on the same proof." Dunbar v. Thompson, 79 Hawai'i 306, 315, 901 P.2d 1285, 1294

(App. 1995); <u>Kanahele v. Han</u>, 125 Hawai'i 446, 461 n.25, 263 P.3d 726, 741 n.25 (2011). While the Circuit Court's award of general damages of this magnitude for, *inter alia*, Michael's "psychological injury" does not lead to the conclusion that Plaintiff is entitled to recover special damages for Michael's future treatment stemming from that injury, it adds further support to our conclusion that, based on the evidence presented, the unchallenged findings, the other special damages awarded, the Circuit Court's attempt to counsel Michael, and the entire record in this case, we are left with a firm and definite conviction that a mistake has been made and the Circuit Court erred in finding that Michael does not require a course of residential psychosexual treatment or any other treatment for any injury resulting from the sexual abuse and other torts established in this case. On remand, the Circuit Court shall decide the appropriate treatment and corresponding special damages Plaintiff is entitled to receive.

C.    <u>Plaintiff's Attorneys' Fees</u>

Plaintiff contends that the Circuit Court abused its discretion when it denied Plaintiff's request for attorney's fees. In light of our decision to vacate in part and remand this case for further proceedings, we vacate the order denying attorneys' fees to allow further consideration of the issue in conjunction with the trial court's further ruling on the issue of damages.

V.    <u>CONCLUSION</u>

For the foregoing reasons, we vacate in part and remand this case to the Circuit Court for further proceedings on the issues of special damages and attorney's fees. In all other

respects, the Circuit Court's November 17, 2009 Judgment is affirmed.

DATED:   Honolulu, Hawai'i, May 7, 2013.

On the briefs:

Caron M. Inagaki
Kendall J. Moser
Deputy Attorneys General
for Defendant-Appellant/
Cross-Appellee

James J. Bickerton
Daniel A. Morris
(Bickerton Lee Dang &
  Sullivan)
for Plaintiff-Appellee/
Cross-Appellant

*Craig H. Nakamura*
Chief Judge

Associate Judge

Associate Judge